## EXHIBIT A
## VERIFICATION AND AFFIDAVIT IN SUPPORT OF COMPLAINT

Now comes Timothy A. Ferguson, Special Agent for the Federal Bureau of Investigation ("FBI"), United States Department of Justice, hereinafter referred to as the Affiant, being first duly sworn, upon his oath, states:

## INTRODUCTION

1.      I am a Special Agent with the Federal Bureau of Investigation ("FBI"), United States Department of Justice, Cincinnati Division, Dayton Resident Agency.  I have been employed as an Special Agent with the FBI since August 2002.  I have received training in drug trafficking investigations and have participated in numerous narcotic related arrests and convictions, narcotic related surveillance, investigations involving the distribution of narcotics and conspiracy to distribute narcotics, money laundering offenses, supervised the activities of informants who have provided information and assistance which resulted in the seizure of narcotics resulting in drug purchases and drug convictions.  Based on my  training and experience, I am familiar with federal drug laws, and I am aware that it is a violation of Title 21, United States Code, Sections 841(a)(1) and 846 to possess cocaine with the intent to distribute; and to knowingly and intentionally launder and conspire to launder monetary instruments, in violation of Title 18, United States Code, §§ 1956 & 371.

3.      As a result of the investigation of matters referred to in this affidavit together with information contained in law enforcement reports of investigation, and other information made available to me by other law enforcement officials, your Affiant is familiar with the facts and circumstances of this investigation.   The information contained in this affidavit is largely based upon investigation conducted by members of the Greene County ACE Task Force and information that has been provided to me by the Task Force.  This affidavit does not detail every fact known to the Affiant.

4.      Based on the aforementioned experience, Affiant is familiar with the modus operandi of persons involved in the illicit distribution of controlled substances and knows the following:

        a.      It is common practice drug traffickers and drug distributors  hide their assets, their addresses, their telephone and beeper/pager services by using other person's names in order to avoid discovery by law enforcement officials;

        b.      It is common practice that drug traffickers and drug distributors often maintain residences which are used as stash houses or locations for drug storage and distribution and use nominees to obtain telephone service,

utility service, et cetera, once again to hide the true identity of the owner or person who will use that service;

c.   That drug traffickers and drug distributors often place assets in corporate entities in order to avoid detection of those assets by law enforcement officials;

d.   It is common practice that even though these assets are in nominee names, drug traffickers and drug distributors continue to utilize these assets by exercising dominion and control over them;

e.   It is common practice that drug traffickers and drug distributors maintain on hand large amounts of U.S. Currency in order to finance their ongoing drug business;

f.   It is common practice that drug traffickers and drug distributors maintain books, records, receipts, notes, ledgers, airline tickets, money orders, and other documents relating to the transportation and distribution of drugs; drug traffickers and drug distributors commonly front (provide drugs on consignment) to their clients; that the aforementioned books, records, receipts, notes, ledgers, et cetera, are maintained where the drug traffickers and drug distributors have ready access to them;

g.   That it is common for drug traffickers and drug distributors to provide false information to law enforcement officials regarding their identity and the  actual address of their residence;

h.   That it is common for drug traffickers and drug distributors to conceal drugs, contraband, proceeds of drug sales, at locations within their residences and/or their businesses and within vehicles located at their residences and/or businesses from law enforcement officials;

i.   That persons involved in drug trafficking and drug distribution conceal in their residences and businesses, drugs, large amounts of currency, financial instruments, jewelry, automobile titles, other items of value and/or proceeds of drug transactions and evidence of financial transactions relating to the obtainment and concealment of large sums of money acquired from engaging in drug trafficking and drug distribution activities;

j.   That when drug traffickers and drug distributors amass large proceeds from the sale of drugs, the drug traffickers and drug distributors attempt to legitimize (launder) these profits; that to accomplish these goals, drug traffickers and drug distributors many times utilize banks and/or financial institutions with their attendant services, including but not limited to,

cashier's checks, money drafts, letters of credit, et cetera; that other entities used to launder moneys  include real estate firms and purported legitimate business fronts;

k.    It is common practice that drug traffickers and drug distributors commonly travel to purchase and distribution areas to facilitate their trafficking; that after purchasing drugs, the traffickers and drug distributors would transport, or cause to be transported, drugs to areas in which they will distribute the drugs; and that the methods of transportation include, but are not limited to, commercial airlines and rental and private automobiles;

l.    It is common practice that drug traffickers and drug distributors commonly maintain addresses or telephone numbers in books and documents which reflect names, addresses, and/or telephone numbers of their associates in the trafficking and drug distribution organization;

m.    That drug traffickers and drug distributors take, or cause to be taken, photographs of themselves, their associates, their property and their product, and that the photographs are usually maintained at the residences and/or businesses of traffickers and drug distributors;

n.    That drug traffickers and drug distributors have in their possession, (that is on their persons, at their residences, and/or their businesses), firearms, including but not limited to, handguns, pistols, revolvers, rifles, shotguns, machine guns, knives, and other weapons; that said firearms are used to protect and secure a drug trafficker's and drug distributor's property which may include, but is not limited to, narcotics, jewelry, narcotics paraphernalia, books, records, U.S. Currency, et cetera;

o.    That drug traffickers and drug distributors frequently maintain hidden compartments within their residences and vehicles, as well as bury drugs, money, and other items of evidence in containers such as shoe boxes, in safes, or hidden compartments inside the residences;

p.    That the exact quantities, prices, dates, and methods of delivery of drugs are seldom discussed in detailed terms over the telephone.  These details are usually agreed upon during face-to-face transactions.  For this reason, most telephone conversations regarding drugs are very brief, and often in code, understood by the traffickers and drug distributors, but designed to mislead or confuse non-participants of the conversations; that drug traffickers and drug distributors make extensive use of cellular phones, text messaging beepers/pagers to facilitate contacting one another such as calling a beeper/pager and then inputting the number that should be called

and even, perhaps, adding additional instructions in the form of additional digits; that the structure of a drug distribution organization involving marijuana and/or cocaine usually consists of sources of supply, wholesale distributors, retail distributors, and the ultimate consumers. The wholesale distributors  often have more than one source of supply, and likewise the retail distributors often obtain drugs from more than one wholesale distributor.  After receiving a quantity of drugs, the source of supply will often move it to a location other than where he/she sells it to the wholesale distributors.  The location of the source of supply's so-called "stash house" is generally a well guarded secret known only to the source of supply and his closest associates.  Most of the drugs, as well as diluting and packaging materials, and weighing equipment, are usually kept at the "stash house", and only those amounts needed for immediate sale are kept at the point of sale;

q.     That drug traffickers and drug distributors frequently use rental vehicles for everyday  travel and will maintain another vehicle, usually at an out of sight location, to facilitate their drug trafficking business.

5.     This affidavit is submitted in support of a Complaint for Forfeiture of the Defendant Account Contents from Key Bank Account Number ****6355 in the name of Greene County prosecutor's office, BAKARI ENTERPRISE totaling $375,059.90.

6.     Based upon the information listed below, it is my opinion that the above currency is subject to forfeiture to the United States of America pursuant to Title 21 U.S.C. §881(a)(6) and 18 U.S.C. §981(a)(1)(A) and (C).

## VERIFICATION OF COMPLAINT

7.     I have carefully read the Verified Complaint for Forfeiture to which this Affidavit is attached and hereby verify that the facts stated therein are true and correct.

## FACTS

8.     The Greene County ACE Task Force has been investigating  UMOJA IDDI BAKARI for drug trafficking.  Greene County was pursuing criminal prosecution of BAKARI for illegal drug dealing.  However, before completion of the prosecution, BAKARI committed suicide.  Consequently, this civil action is being filed to forfeit the proceeds of the BAKARI criminal enterprise.

9.     In February of 2004, UMOJA IDDI BAKARI came forward and gave information about the January 2002, murder of a Yellow Springs High School student by the name of Timothy Lopez that led to Greene County law enforcement finding the

remains of Timothy Lopez buried in the back yard of Michael Rittenhouse, a high school classmate.  Rittenhouse was charged and pled guilty to Murder and Gross Abuse of a Corpse in March of 2005. Rittenhouse is doing a term of 15 years to Life.

10.     BAKARI came forward with the information on the Lopez case because he had been charged in Franklin County with Felonious Assault and Kidnaping and was facing trial in April of 2004. The Franklin County case alleged that BAKARI had abducted and shot a teenager whom he accused of taking his "property" from his apartment in Columbus. After cooperating with Greene County on the Lopez murder case, BAKARI pled to assault and did 6 months in the Franklin County jail. During the investigation of the Lopez murder case, Greene County law enforcement became aware of a drug trafficking enterprise that was being operated by BAKARI between Columbus and Yellow Springs, Ohio.

11.     Since 2004 the Greene County ACE Task Force continued to receive information on the BAKARI drug enterprise which remained active. BAKARI was selling marijuana and cocaine to the student market at Ohio State and he continued to supply persons in the Yellow Springs area, including the high school market. Michael Rittenhouse had been one of BAKARI'S lieutenants selling drugs for BAKARI to young people in the Yellow Springs area.

12.     In 2008, Greene County Ace Task Force discovered that BAKARI had been buying real estate in Franklin County. The Task Force learned that BAKARI bought for cash two properties: 2965 Queensrowe, and 105 N. Wayne. The North Wayne property was owned 50/50 with a person named JAMES JACKSON, who is an unindicted co-conspirator in the BAKARI drug enterprise. Three other properties were purchased with mortgages obtained by BAKARI'S wife, BEKELECH ASEFA. Those properties are on 726-728 S. Hamilton, 1997-2003 Grasmere and 2137 Gaylord, all in Columbus, Ohio. Two of the three mortgaged properties are currently in foreclosure.

13.     Greene County's investigation showed two bank accounts that were being used as money laundering accounts, a US bank account in JACKSON'S name and a Huntington bank account in BAKARI and his wife BEKELECH ASEFA'S name. A total of $83,599.53 was paid either in cash sales or down payments on the real estate. The loan documents signed by the wife, BEKELECH ASEFA, represented that she made $3800.00 a month on one form and $5000.00 a month on another, as the manager of the DREAM NIGHT LOUNGE, which is on Allegheny Street in Columbus. BEKELECH ASEFA'S brother, SISAY ASEFA, owns the DREAM NIGHT LOUNGE, formerly known as the "Marquee".

14.     Prior to one of the sales of real estate, SISAY ASEFA gave his sister a "gift" of $8,000.00. On another sale, the realtor who was a friend of BAKARI'S, provided

a check for $15,000.00 and wrote on the check that it was for a "consulting fee". The realtor, Mark Wolfe, said BAKARI gave him $15,000.00 in cash and asked him to deposit it in his account and write a check to BEKELECH ASEFA. BAKARI wanted it to be deposited in the Hamilton Bank account to show that he had money and his wife could get a mortgage. Wolfe said BAKARI'S wife knew about the circumstances of that transaction.

15.     On April 22, 2008 BAKARI was indicted in Greene County as part of a continuing course of conduct, for 22 felony counts, including Engaging in a Pattern of Corrupt Activity, Conspiracy, various drug trafficking counts and money laundering.  On June 24, 2008 BAKARI was arrested in Dekalb County, Georgia. On June 27, 2008, UMOJA IDDI BAKARI hanged himself in the Dekalb County Jail.

16.     BAKARI'S wife, BEKELECH ASEFA, gave a written statement to the Task Force that BAKARI did nothing but sell drugs and she allowed her name and credit to be used to get mortgages. She said BAKARI told her he wanted to do something "good with his life" and she wanted to help him so she arranged to buy the houses he and the realtor had picked out from foreclosure sales in Franklin County. She says that she just signed the loan documents even though the income information was false. Her brother, SISAY ASEFA, provided W2 statements and a letter to confirm she made the monthly income that allowed her to get the mortgages. SISAY ASEFA also gave her a letter saying she made $161.00 a week so she could get a Medicaid card for her son, Elias Bakari.

17.     GEBRO AGRESH, the mother of BAKARI'S wife, BEKELECH ASEFA, gave consent to Grene County to search Box 3437 at Chase Bank.  The names on the box were GEBRO AGRESH (BAKARI'S mother-in-law) and SISAY ASEFA, (BAKARI'S brother-in-law).  GEBRO AGRESH and SISAY ASEFA are mother and son.  The bank's log of person's gaining access to the box indicate that only GEBRO AGRESH had accessed the box prior to the contents being removed by Greene County.  The amount of $197,400.00 in cash was found and seized. A drug dog alerted to the presence of narcotics on the $197,400.00.

18.     GESIT ASIFA, BAKARI'S brother-in-law, gave consent to Greene County to search Box 630 at the $5^{th}/3^{rd}$Bank, which was in the name of GESIT ASEFA, another brother of BECKLECH ASEFA.  GESIT ASEFA told Greene County agents that there were baseball cards in the box.  GESIT ASEFA said if they didn't find baseball cards and it was cash, the money belonged to BAKARI, his brother-in-law, and BAKARI deserved to have it taken. There was $135,000.00 in the box.  A drug dog alerted to the presence of narcotics on the $135,000.00.

19.     ABREWAT AZANAW, the girlfriend of GESIT ASEFA, (BAKARI'S
        brother-in-law) gave consent to Greene County to search Box 721 at 5th/3$^{rd}$Bank.
        The box was in the name of ABREWAT AZANAW.  The amount of $28,900.00
        in cash was discovered. ABREWAT AZANAW stated that the contents of the
        box was her live savings.  A drug dog alerted to the presence of narcotics on the
        $28,900.00.

20.      Greene County executed a search warrant at the home of AGRESH GEBRO
        (BAKARI'S mother-in-law) and MULAW ASEFA, (BAKARI'S father in-law),
        i.e., the parents of BEKELECH ASEFA.  At the time the search warrant was
        executed, BAKARI'S mother and father-in-law appeared to be living beyond their
        legitimate means.  The amount of $4,220.00 in cash was found in a lock box in a
        bedroom. Also seized from the house were greenish brown vegatable matter, and
        a bullet proof vest.  A drug dog alerted to the presence of narcotics on the
        $4,220.00. A drug dog alerted to the presence of narcotics on the $4,220.00.

21.     Greene County executed a search warrant at the home of JAMES JACKSON.
        JACKSON is an unindicted co-conspirator of BAKARI, and found the sum of
        $2,509.00. Also found at JACKSON'S home during the execution of the search
        warrant were: separately packaged marijuana, digital scales and hand guns.  A
        drug dog alerted to the presence of narcotics on the $2,509.00.

22.     Finally, a search warrant was executed on Box 988 at the Huntington Bank, and
        $1,490.00 in cash was found. The box was in the names of BAKARI and his
        brother MARTIN BAKARI. MARTIN BAKARI is a college student at Boston
        University. A drug dog alerted to the presence of narcotics on the $1,490.00.

23.     All of the drug dog sniffs were conducted by Beavercreek Police Canine Officer
        Williams and his canine DJ.  The controlled sniffs took place at the Yellow
        Springs Municipal Building Conference Room B.  Present during the sniff were
        Officer Williams, Canine DJ, YSPD Evidence/Property Room custodian Ken
        Metz and Detective R. Miller.  The controlled sniff was captured on DVD
        recorder and a quality copy was produced.  Before conducting the controlled sniff
        on any monies, canine DJ conducted a controlled sniff on a sum of money that
        was going to be used as control money.  This money was received from Bruce
        May, Director, Greene county Ace Task Force.  The control money was placed in
        separate envelopes and placed on the floor of the conference room.  Canine DJ
        did not alert to any of the control money.  Then the control money was placed in
        two brown paper bags and set along side with the seized money.  The sniff was
        conducted 5 times, each time with two bags of control money and one bag of
        money seized from one of the locations described in paragraphs 17-22 above.
        Each time, canine DJ alerted to the bag containing the seized money and not the
        control money.

24.     All of the money seized by Greene County ACE Task Force was put it the Defendant Key Bank #6355.  The difference between the totals of the amounts seized as described in paragraphs 17-22 above, and the amount that was seized out of the Key Bank Account in the name of Greene County Prosecutor's Office, BAKARI Enterprise, is the interest that was earned on the contents of the account.

25.     CHELSE HORNSBURGER, BAKARI'S girlfriend, was also indicted and later proffered, giving a full recitation of BAKARI's drug dealing activities and the players in the distribution efforts. HORSNBURGER confirmed that BAKARI did nothing but sell drugs and she acted as his courier.

26.     The day after the $197,400.00 was seized, SISAY ASEFA called the ACE Task Force and in a recorded phone call said the money in the safe deposit box was being kept there to hide it from the Boxing Commission and the IRS. He wanted his money back.

27.     On July 3, 2008, Greene County filed a civil forfeiture in the Greene County Common Pleas Court against the assets of UMOJA IDDI BAKARI.  In Re: Forfeiture of Property and Real Estate of UMOPJA IDDI BAKARI, Greene County Common Pleas Case No. 2008CV792.

28.     To obtain an entity to serve the forfeiture action, Greene County opened up a probate estate for BAKARI in Franklin County.  Rather deposit the seized funds into a custodial account under Probate court control, Greene County sought and obtained an order in the civil forfeiture action which restrained Greene County from dissipating the money.

29.     On November 24, 2008, the state civil forfeiture action was dismissed.  As a result of the dismissal of the forfeiture action, the Restraining Order was also dismissed.

30.     On November 25, 2008, a civil seizure warrant was obtained in the U.S. District Court for the Southern District of Ohio, for the seized funds.  Account at Key Bank #****6355, In the Name of Greene County Prosecutors Office, BAKARI ENTERPRISE, Case No. 3:08mj222MRM.  The seizure warrant was executed on November 25, 2008, and the amount of $375,059.90 was seized.

Page 8 of  9

31.     Based upon the facts set forth in the Complaint, and above, I believe the Defendant Account Contents from Key Bank Number #****6355, In the name of Greene County Prosecutor's office, BAKARI ENTERPRISE, in the amount of $375,059.90 is subject to forfeiture to the United States of America pursuant to Title 21 U.S.C. §881(a)(6) and 18 U.S.C. §981(a)(1)(A) and (C).

FURTHER AFFIANT SAYETH NAUGHT.

s/Timothy A. Ferguson
Timothy A. Ferguson, Special Agent
Federal Bureau of Investigation

STATE OF OHIO                    )
                                         SS
COUNTY OF MONTGOMERY     )

On this 23rd day of January, 2009, personally appeared Timothy A. Ferguson who, being first duly sworn, upon his oath, signed the above Affidavit and Verification of Complaint.

s/Pamela M. Stanek
Pamela M. Stanek, Notary Public
In and For the State of Ohio
My Commission does not expire